UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - FLINT

IN RE:

JEREMY BELLANTI,                              Case No. 08-33895-dof
                Debtor.                       Chapter 7 Proceeding
                                              Hon. Daniel S. Opperman
_____/
LAND ESCAPE OUTDOOR MAINTENANCE, L.L.C.,
d/b/a OUTDOOR CREATIONS,
        Plaintiff,

v.                                            Adversary Proceeding
                                              Case No. 09-3004-dof
JEREMY BELLANTI,
        Defendant.
_____/

<u>TRIAL OPINION</u>

<u>Introduction</u>

The Plaintiff Land Escape Outdoor Maintenance, L.L.C. d/b/a Outdoor Creations ("Land

Escape"[1]) claims that the Defendant, Jeremy Bellanti, owes it $480,669.72 and that this debt is

excepted from discharge pursuant to 11 U.S.C. § 523(a)(2), 11 U.S.C. § 523 (a)(4), and 11 U.S.C.

§ 523(a)(6). Land Escape also objects to the discharge being granted to Jeremy Bellanti; Jeremy

Bellanti disagrees with Land Escape's positions. After 15 days of trial in which Jeremy Bellanti,

his wife Courtney Bellanti, and Chris Yatooma, the controlling member of the Plaintiff, testified and

after admission of 171 exhibits, as well as careful consideration of the testimony and exhibits, the

Court concludes that the Plaintiff, Land Escape Outdoor Maintenance, L.L.C., has failed to state a

cause of action against the Defendant, Jeremy Bellanti, all for the reasons stated in this Opinion.

_____

[1] The Plaintiff throughout this case has referred to itself as either Land Escape or Outdoor
Creations. For sake of consistency, the Court will refer to the Plaintiff and its various entities as
Land Escape.

1

<u>Findings of Fact</u>

Mr. Bellanti worked at a company known as UniLock from 1995-2005. During his tenure, Mr. Bellanti worked his way through various positions at UniLock ranging from customer service, dispatching, and sales. UniLock was generally engaged in the decorative stone business and it was in that capacity that Mr. Bellanti met Mr. Yatooma, who was involved in the landscaping business. Prior to leaving UniLock, Mr. Bellanti formed a company known as Intex Group, which he created to do interior remodeling in harsher months and exterior remodeling during milder months.

Mr. Yatooma tried to convince Mr. Bellanti to work for him, but Mr. Bellanti declined because he wanted to fulfill a lifelong dream of running his own business. After leaving UniLock in 2005, Mr. Bellanti and Mr. Yatooma regularly met and discussed various projects. During this initial time, Intex would perform work for Land Escape and invoice Land Escape; Land Escape would perform work for Intex and invoice Intex. After approximately six months, by the start of the landscaping season in 2005, Land Escape entered the decorative stone business by hiring separate crews to install decorative stones.

Earlier, Land Escape only performed general landscaping, lawn, and yard services for commercial and residential customers. These services focused on live plants and natural materials. A potentially lucrative segment of this market is the design and installation of walkways, driveways, and structures made of natural or manmade products which, for purposes of this Opinion, will be referred to as the decorative stone business. Initially, Land Escape did not enter this portion of the market because many of its customers or referral sources were active in this market. After entering the decorative stone business, Land Escape walked the fine line of competing with its customers and referral sources, but also reaping the benefit from its customers and referral sources. It did so by having Intex act as the company that did this work, but with Land Escape employees and resources.

2

Intex, by appearing to be doing the decorative stone business, allowed Land Escape to walk that line easier.

Mr. Yatooma and Mr. Bellanti disagree as to the nature of their understanding at this time. Mr. Yatooma testified that he had an agreement with Mr. Bellanti where Mr. Bellanti would follow up on any leads for decorative stone work, meet with the owner, ascertain the owner's request for decorative stone work, draw plans and proposals for decorative stone work, meet with the owner, and hopefully sell the owner on the project as proposed by Mr. Bellanti. After the sale was complete, Mr. Bellanti was then charged with the task of overseeing the completion of the project and collecting time sheets from the various Land Escape employees and reporting the time in a comprehensible manner to Land Escape's front office. In return, Mr. Bellanti was given an office at Land Escape, business cards with Land Escape's name, a credit card, and check writing authority on a Land Escape bank account. Mr. Yatooma also testified that all monies from these projects were to be deposited into a Land Escape bank account. After all monies were received, Land Escape would pay all bills related to the project, including phone, gas, payroll, administrative costs, insurance, and advertising. After payment of these expenses, any profits were divided with Land Escape receiving two-thirds and Mr. Bellanti receiving one-third.

In stark contrast, Mr. Bellanti admits receiving business cards, a credit card, and check writing authority, and acknowledges that an office was set aside for him, but denies the relevant other conditions testified by Mr. Yatooma.

Neither Land Escape or Mr. Bellanti reduced the terms of their understanding in writing.

From 2005-2007, Mr. Bellanti did follow up on leads, met with owners, designed plans and proposals, made sales, supervised Land Escape's decorative stone employees, and received and

3

reported the hours stated by the Land Escape employees. After a project was completed, Intex billed the owner or contractor and received payment. In turn, Land Escape, through Mr. Yatooma, routinely requested payment to meet its payroll expenses and Ms. Bellanti, who handled the records and bank accounts of Intex, routinely forwarded substantial sums to Land Escape. This was generally accomplished by Mr. Yatooma calling Ms. Bellanti to request a sum certain, usually an even amount, and then Ms. Bellanti would either directly deposit that amount into a Land Escape account or otherwise deliver the funds to Land Escape. All of these payments were made at the request of Mr. Yatooma, none were made pursuant to an invoice from Land Escape to Intex and none were identified by Land Escape for a particular project. In an effort to add some sort of structure to the relationship, Ms. Bellanti noted various accounts on each check with various degrees of accuracy to the actual project on hand. During all of this time, Mr. Yatooma repeatedly assured Mr. and Ms. Bellanti that he would provide a specific request and accounting of the funds at the end of the landscaping year. This accounting was not provided by Land Escape in 2005. During this time, Mr. Bellanti received some advances from Land Escape to compensate for his time or for the gas and maintenance for his truck that he drove conducting Land Escape's business. In total, Mr. Bellanti received $14,500.00.

The same course of business continued in 2006 and 2007. Subsequently, Land Escape believed it was owed substantial sums of money and Mr. Bellanti believed he was owed substantial sums of money. Through October of 2007, Mr. Bellanti and Mr. Yatooma discussed the business relationship almost daily, with Mr. Bellanti continually advising Mr. Yatooma that the enterprise was making money. Mr. Yatooma testified that on October 15, 2007, Mr. Bellanti "confessed" that the enterprise was indeed not making money and that he had taken certain monies that belonged to Land Escape. Again, Mr. Bellanti's testimony is in direct contrast and contradiction to that of Mr. Yatooma. Instead, Mr. Bellanti testified that the enterprise was not successful because one major

customer, Todd's Services, failed to make timely payments and in fact bounced a number of checks that were delivered as payment.

By 2008, Intex filed a Chapter 7 bankruptcy petition on September 24, 2008, and Mr. Bellanti filed a Chapter 7 bankruptcy petition on that same date. Thereafter, in an effort to determine the amount owed to it and as part of this adversary proceeding, Land Escape prepared a number of exhibits detailing where it believed the money was misapplied and showing on a project-by-project basis its actual costs. As a result, the parties identified the following projects:

| Job Name By Customer Name With Identification Of Project Name | Amount Due To Outdoor Creations Without Interest |
|---|---|
| 3D Design; Hilton | $6,850.04 |
| 3D Design; Largin, Saline | $2,687.62 |
| 3D Design; Residence, Howell | $4,097.20 |
| Blough; Rosewood, NV | $9,074.91 |
| Foster; Rock Spring, Bloomfield Hills | $266.67 |
| Homa Torab | $3,275.80 |
| Lee; Lakewood Shores, Howell | $7,997.43 |
| Martina; Winchester, Hunt Wds | $1,913.95 |
| McCall; Remsing | $753.95 |
| MCS | $7,340.64 |
| National; Base Lake Drive | $312.78 |
| National; Sample | $938.34 |
| National; Donnelly | $1,958.10 |
| National; Gray | $361.18 |

5

| Job Name By Customer Name With Identification Of Project Name | Amount Due To Outdoor Creations Without Interest |
| --- | --- |
| National; Neighbors | $1,277.63 |
| National; Rashid | $1,548.95 |
| National; Siller, Michael, Comm | $21,059.10 |
| Schmidt; Rolling Pines Ct, Comm | $2,057.87 |
| Suburban; Thomas, Edgewood, Union Lake | $11,702.57 |
| Suburban; Wyngate St | $1,695.85 |
| Terrafirma; Aquino | $13,610.91 |
| Terrafirma; Bailey | $2,181.70 |
| Terrafirma; Boyer | $2,376.86 |
| Terrafirma; Carinduff | $1,679.90 |
| Terrafirma; Conn | $3,547.30 |
| Terrafirma; Courtney | $3,486.58 |
| Terrafirma; Cowley | $1,668.54 |
| Terrafirma; Crane | $12,142.01 |
| Terrafirma; Davis | $1,545.04 |
| Terrafirma; Demster | $1,624.86 |
| Terrafirma; Detrich | $909.15 |
| Terrafirma; Donovan | $10,741.47 |
| Terrafirma; Douglas | $2,507.30 |
| Terrafirma; Forest Hill | $4,160.52 |
| Terrafirma; Garavalia | $2,669.52 |
| Terrafirma; Gerbstradt | $1,739.85 |
| Terrafirma; Harris | $15,099.56 |
| Terrafirma; Hildabrandt | $800.55 |
| Terrafirma; Hillegas | $4,089.44 |

| Job Name By Customer Name With Identification Of Project Name | Amount Due To Outdoor Creations Without Interest |
| --- | --- |
| Terrafirma; Jenson | $2,973.27 |
| Terrafirma; Johnson | $7,860.24 |
| Terrafirma; Joseph | $4,080.19 |
| Terrafirma; Leone | $1,475.19 |
| Terrafirma; Meyers, Turtle Lake | $20,047.15 |
| Terrafirma; Moltaine (Todds; Moltane) | $5,105.68 |
| Terrafirma; Mueller | $22,190.86 |
| Terrafirma; Nally | $7,151.27 |
| Terrafirma; Nigam (Todds; Nigam) | $2,477.38 |
| Terrafirma; Norton | $3,489.44 |
| Terrafirma; Olsen | $10,585.21 |
| Terrafirma; Patterson | $781.95 |
| Terrafirma; Peck | $1,290.22 |
| Terrafirma; Peterson | $4,483.01 |
| Terrafirma; Plond | $4,435.26 |
| Terrafirma; Rose | $4,763.00 |
| Terrafirma; Scholl | $8,984.11 |
| Terrafirma; Seward | $4,141.53 |
| Terrafirma; Thomas (Jeff Thomas) | $10,024.10 |
| Terrafirma; Vanderhyde | $4,455.33 |
| Terrafirma; Voegeli | $3,449.78 |
| Terrafirma; Walsh | $2,960.34 |
| Terrafirma; Williams | $5,329.43 |

| Job Name By Customer Name With Identification Of Project Name | Amount Due To Outdoor Creations Without Interest |
|---|---|
| Terrafirma; Ypsilanti | $413.06 |
| Todds; Bach | $6,847.10 |
| Todds; Baisch | $6,153.13 |
| Todds; Berry | $16,375.52 |
| Todds; Butler | $1,439.98 |
| Todds; Estes | $3,557.56 |
| Todds; Funk (Ron Funk) | $659.96 |
| Todds; Housewright | $11,895.11 |
| Todds; Irey | $15,754.96 |
| Todds; Kantor | $12,132.11 |
| Todds; Kleinsorge | $22,516.83 |
| Todds; LaLonde | $5,709.95 |
| Todds; Lickford | $6,129.24 |
| Todds; McGregor | $2,355.85 |
| Todds; McMalley | $3,155.18 |
| Todds; Nakogari | $12,030.24 |
| Todds; Peters | $2,444.33 |
| Todds; Poncedeleon | $12,261.08 |
| Todds; Rose | $6,583.35 |
| Todds; Skandalaris | $8,458.52 |
| Todds; Weisman | $4,836.62 |
| US Steel | $2,674.62 |

<u>Applicable Statutes and Authorities</u>

The Plaintiff's Complaint is based on numerous provisions of the Bankruptcy Code. The

Court will state the general authority for each Code section and then analyze each section.

A.    <u>Action for Exception to Discharge (11 U.S.C. § 523(a)(2))</u>

Under Section 727 of the Bankruptcy Code, a debtor may obtain a general discharge from

all debts that arose before the order for relief. 11 U.S.C. § 727(b). However, there are exceptions

for certain obligations, including debts for money obtained by fraud or by use of a false statement

in writing. 11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) provides:

> (a) A discharge under section 727 . . . does not discharge an individual debtor from any debt –
>
> (2) for money, property,[2] services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> To prevail on a claim under 523(a)(2)(A), a plaintiff must show that:
>
> (1) [T]he debtor obtained money through a material misrepresentation that at the time the debtor knew was false or that he made with reckless disregard for the truth; (2) the debtor intended to deceive; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert),*141 F.3d 277, 280 (6th Cir. 1998).

Whether a debtor possessed intent to deceive is measured by a subjective standard. *Id.*

The purpose of section 523(a)(2) is to prevent debtors from retaining the benefits of property

obtained through fraud. *XL/Datacomp, Inc. V. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443,

---

[2]The term "property" as used in section 523(a)(2)(A) "denotes something subject to ownership, transfer, or exclusive possession and enjoyment, which may be brought within the dominion and control of a court through some recognized process." *Gleason v. Thaw,* 236 U.S. 558, 561 (1915).

9

1451 (6th Cir. 1994). Plaintiff must show each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286 (1991). Even so, the court must construe all of the exceptions to discharge strictly, and must give the benefit of the doubt to debtor. *Rembert,*141 F.3d at 281.

The United States Supreme Court held in the case of *Husky Int'l Elec., Inc. v. Ritz*, 136 S.Ct. 1581, 1586 (2016), held that "actual fraud" under Section 523(a)(2)(A) does not require a false representation. In *Husky*, the debtor was the principal of a debtor corporation that had previously transferred assets without consideration to other companies he controlled in order to avoid payment to creditors of the initial debtor corporation. *Id*. at 1585. The *Husky* Court held that forms of fraud other than false representations, such as the fraudulent conveyance scheme present in that case, can constitute "actual fraud" under Section 523(a)(2)(A). *Id*. at 1590.

Intent, under *Rembert*, is measured subjectively. *Rembert*, 141 F.3d at 281. A debtor intends to deceive a creditor "when the debtor makes a false representation which the debtor knows or should have known would induce another to advance goods or services to the debtor." *Bernard Lumber Co. v. Patrick (In re Patrick)*, 265 B.R. 913, 916 (Bankr. N.D. Ohio 2001). "Fraudulent intent requires an actual intent to mislead, which is more than mere negligence. . . . A 'dumb but honest' [debtor] does not satisfy the test." *Palmacci v. Umpierrez*, 121 F.3d 781, 788, (1st Cir. 1997) (citations omitted). A debtor's fraudulent intent

> may be inferred from the totality of the circumstances. The bankruptcy court must consider whether the totality of the circumstances' presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor.' The court may consider not only the debtor's conduct at the time of the representations, but may consider subsequent conduct, to the extent that it provides an indication of the debtor's state of mind at the time of the actionable representations.

*Wolf v. McGuire (In re McGuire)*, 284 B.R. 481, 492 (Bankr. D. Col. 2002)(quoting *Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (B.A.P. 10th Cir. 2000) (citations omitted)). "A creditor can

present proof of surrounding circumstances from which a [c]ourt can infer a dishonest intent."

*Comm. Bank & Trust Co. v. McCoy (In re McCoy),* 269 B.R. 193, 199 (Bankr. W.D. Tenn. 2001).

As explained by the court in *Haney v. Copeland (In re Copeland)*, 291 B.R. 740 (Bankr. E.D. Tenn. 2003):

> Proving the Debtor's intent to defraud is similar to proving the Debtor's knowledge and/or recklessness as to the falsity of the representations made. Because intent is a purely subjective question, the court must examine the totality of the Debtor's actions to determine if she possessed the requisite intent to deceive the Plaintiffs. Any benefit of the doubt must be resolved in favor of the Debtor, as § 523(a)(2) is strictly construed in her favor. *XL/Datacomp, Inc. v. Wilson (in re Omegas Group, Inc.*), 16 F.3d 1443, 1452 (6th Cir. 1994).

*Id*. at 760.

B.      <u>Action for Exception to Discharge (11 U.S.C. § 523(a)(4))</u>

Section 523(a)(4) also excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . ." The Sixth Circuit has held that § 523(a)(4) requires:

> (1) a fiduciary relationship
>       (a) in the form of an express trust or
>       (b) technical trust relationship;
> (2) breach of that fiduciary relationship; and
> (3) a resulting loss.

*R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176, 178-79 (6th Cir. 1997); *see also Patel v. Shamrock Floorcovering Services, Inc. (In re Patel)*, 565 F.3d 963 (6th Cir. 2009); *In re Johnson*, 691 F.2d 249, 251-52 (6th Cir. 1982) (finding that fiduciary capacity "applies only to express or technical trusts and does not extend to implied trusts, which are imposed on transactions by operation of law as a matter of equity" and "the requisite trust relationship must exist prior to the act creating the debt and without reference to it") (citations omitted).

11

To establish the existence of an express trust, the plaintiff "must demonstrate: (1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary." *In re Patel*, 565 F.3d at 968 (internal quotation marks and citation omitted).

1.    Defalcation

The Sixth Circuit Court of Appeals has held that defalcation for purposes of § 523(a)(4) "occurs through the misappropriation or failure to properly account for those trust funds" by a fiduciary. *Garver*, 116 F.3d at 180 (citation omitted). It requires a "pre-existing fiduciary relationship." *Patel*, 565 F.3d at 968.

The Sixth Circuit Court of Appeals has held that defalcation for purposes of § 523(a)(4) "occurs through the misappropriation or failure to properly account for those trust funds" by a fiduciary. *Garver*, 116 F.3d at 180 (citation omitted). It requires a "pre-existing fiduciary relationship." *Patel*, 565 F.3d at 968.

In *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754 (2013), the Supreme Court decided the level of intent required for defalcation under § 523(a)(4):

> [W]here the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term [defalcation] requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. . . . Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary consciously disregards (or is willfully blind to) a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty. That risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a *gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation.

*Id.* at 1759-60 (internal quotation marks and citation omitted).

The Sixth Circuit has addressed the Michigan Builders Trust Fund Act ("MBTFA") in the context of a § 523(a)(4) non-dischargeability proceeding. "[T]he MBTFA satisfie[s] the necessary requirement that the trust exist separate from the act of wrongdoing as a matter of federal law . . .

." *Patel*, 565 F.3d at 968 (internal quotation marks and citation omitted). Thus "contractors" under the MBTFA "are fiduciaries to their subcontractors under § 523(a)(4)." *Id.; see also Johnson*, 691 F.2d at 252.

The *Johnson* court concluded that

[t]he Building Contract Fund Act satisfies the express or technical trust requirements of section [523(a)(4)]. The trust relationship is unambiguously imposed on a contractor or subcontractor by the language of the statute. The trust res is clearly defined as the monies paid by any person into the building contract fund. The trustee is charged with specific affirmative duties, including paying out trust funds in accordance with the statutorily imposed priority scheme, not using funds for its own purposes so long as trust beneficiaries, laborers, subcontractors and materialmen remain unpaid . . . The fiduciary relationship . . . arises at the time any monies are paid to the contractor or subcontractor whether or not there are any beneficiaries of the trust at that time and continues until all of the trust beneficiaries have been paid.

*Id.* at 252-53.

Therefore, the first element of § 523(a)(4), a fiduciary relationship, is met for funds held under the MBTFA. *See also Patel*, 565 F.3d at 963 ( finding an individual debtor who was an officer, 50% shareholder and day-to-day administrator of affairs of a company hired to act as general contractor was himself a "contractor" subject to liability under the Act).

After the plaintiff establishes a breach of the fiduciary duty, "the plaintiff must demonstrate a loss resulting from the breach." *Sangal v. Strickfaden (In re Strickfaden)*, No. 09-CV-15060, 2010 WL 3583427, at *4 (E.D. Mich. Sept. 9, 2010) (noting there is no defalcation if the funds were spent completing the project or toward contract-related bills). Supplying materials on open account is not sufficient to establish a res required under § 523(a)(4). *Astro Building Supplies, Inc. v. Slavik*, No. 10-2206 (6th Cir. Dec. 12, 2011).

In *Patel*, the Sixth Circuit Court of Appeals discussed intent in the context of the MBTFA. As "carefully explained" in its previous holding in *Johnson*:

defalcation occurs when evidence supports "the objective fact that monies paid into

13

the building contract fund were used for purposes other than to pay laborers, subcontractors or materialmen first is sufficient to constitute a defalcation under section [524](a)(4) so long as the use was not the result of mere negligence or a mistake of fact." Thus, there is no such thing as "defalcation per se" and instead the debtor must have been objectively reckless in failing to properly account for or allocate funds.

*Id.* at 970 (quoting *Johnson*, 691 F.2d at 257). "[T]his Circuit has never countenanced 'innocent' or merely 'negligent' defalcation" as being sufficient to find a debt non-dischargeable under § 523(a)(4). *Id.* The *Patel* Court went on to find that the debtor recklessly misallocated funds, citing his testimony that he paid his own expenses, including his wages, before paying the plaintiff; the debtor's "woefully inadequate" attempts at accounting; and the debtor's concession "that his business operations were sloppy at best . . . ." *Id.* at 971. Supplying materials on open account is not sufficient to establish a res required under § 523(a)(4). Proving the elements of a case under the Michigan Builder's Trust Fund Act, alone, is not sufficient under *Bullock* to entitle a creditor to relief under Section 523(a)(4); rather, the requisite finding of the state of mind of "moral turpitude or intentional wrong" is required. *See Shears v. Vestal (In re Vestal)*, 521 B.R. 604, 610-12 (Bankr. W.D. Mich. 2014) (holding that the burden of proof shifts to the creditor challenging dischargeability to demonstrate that the debtor intentionally or recklessly acted when violating the MBTFA (n/k/a Michigan Building Contract Fund Act, "MBCFA")).

2. Embezzlement and Larceny

"[F]or Section 523(a)(4) purposes, federal common law, rather than state law, controls the meaning of these terms." *Williams v. Noblit (In re Noblit)*, 327 B.R. 307, 311 (Bankr. E.D. Mich. 2005).

"Federal common law defines embezzlement as 'the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.'" *Noblit*, 327 B.R. at 311 (quoting *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th

14

Cir.1996)).

"An essential element of the crime [of embezzlement] is a felonious or fraudulent intent." *People v. Douglass*, 293 Mich. 292 N.W. 341, 388, 391 (1940) (citation omitted). "[T]he requisite intent to defraud must exist at the time of conversion or appropriation of the property to defendant's own use" *People v. Artman*, 218 Mich. App. 236, 241, 553 N.W.2d at 673 (1996). "The mere failure to pay over moneys belonging to another, without a felonious intent, is not embezzlement." *Douglass*, 293 Mich. at 391; *Artman,* 218 Mich. App. 241-42 at 676. "[C]oncealment or its absence, [or] refusal to pay . . . on demand . . . are not to be taken as declared essentials of the offense or defense but merely as circumstances bearing on the intent." *American Life Ins. Co. v. U.S. Fid. & Guar. Co.*, 261 Mich. 221, 224-25, 246 N.W. 71 (1933). "If property is converted without concealment, and under a bona fide claim of right, the conversion is not embezzlement, however unfounded the claim may be." *Douglass,* 293 Mich. at 391.

> Larceny is different [from embezzlement] in that the original taking must have been unlawful, and is defined as "the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use without the consent of the owner."

*Noblit*, 327 B.R. at 311 (quoting *Graffice v. Grim (In re Grim)*, 293 B.R. 156, 166 (Bankr. N.D. Ohio 2003)).

3.   Burden of Proof

Once the plaintiff has established the existence of a trust and that the defendant is a trustee, the burden of proof shifts to the defendant. In *Cappella v. Little (In re Little)*, 163 B.R. 497 (Bankr. E.D. Mich. 1994), the Court found that the question of burden of proof for defalcation while acting in a fiduciary capacity was a substantive question, and thus should be determined under state law. *Id.* at 502. In reviewing Michigan law, the *Little* Court found that

> Michigan courts have repeatedly stated in various contexts that a trustee must account to the beneficiaries for the disposition of trust funds. . . . Failure to properly

so account is, by definition, a defalcation.

It has been stated that the beneficiary has the initial burden of proving the existence of a fiduciary duty and the trustee's failure to perform it . . . [T]he burden then shifts to the trustee . . . to prove it acted with . . . good faith . . . and made full disclosure of all facts related to the transactions at issue. . . . [T]he mere failure to account establishes a loss.

Since trustees have a duty to account under Michigan law, it is only logical that the Debtor, a statutory trustee, must prove that no defalcation occurred – i.e., that he be required to account for the trust funds he received. . . . [T]he Michigan Supreme Court has stated that where a trustee is called upon in a court of equity to account for the funds received by him as trustee, . . . the duty rests upon him to so account, and the burden of proof is upon him to establish the correctness of the account.

*Id*. at 500-01 (internal quotation marks and citations omitted).

4.    Establishing the Amount to be Non-Dischargeable

In *Kriegish v. Lipan (In re Kriegish)*, 275 B.R. 838, 841-42, 845 (E.D. Mich. 2002), the District Court found that the debtor/contractor was able to account for some, but not all, of the funds received, and "the bankruptcy court had the equitable powers to determine the allocation factor that would approximate the amount of funds misspent." *See also In re Little*, 163 B.R. at 504 n.7 (noting that "[a]s a general rule, the debtor is barred by collateral estoppel from relitigating the amount of a debt alleged to be nondischargeable" but there may be exceptions if "it is possible that all or some portion of the debt as determined by the state court may simply reflect the cost to the Plaintiff of completing the project, rather than defalcation by the Debtor").

C.    Action for Exception to Discharge (11 U.S.C. § 523(a)(6))

The Plaintiff also claims its debt is excepted from discharge by virtue of 11 U.S.C. § 523(a)(6).  Section 523(a)(6) authorizes a bankruptcy court to exclude a debtor from receiving a discharge "from any debt for willful and malicious injury by the debtor to another entity or the

16

property of another entity." A party must prove by a preponderance of the evidence that a debtor committed an injury that is both willful <u>and</u> malicious. *Grogan v. Garner*, 498 U.S. 279 (1991).

In *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), the United States Supreme Court discussed and determined the meaning of the language used in 11 U.S.C. § 523(a)(6). The issue before the United States Supreme Court involved "whether a debt arising from a medical malpractice judgment attributable to negligent or reckless conduct" fell within 11 U.S.C. § 523(a)(6). *Id.* at 59. The Kawaauhaus argued that the malpractice award fell within the Section 523(a)(6) exception because Dr. Geiger engaged in the intentional act of providing inadequate medical services which led to Mrs. Kawaauhau's injury. *Id.* at 61.

In analyzing the parameters of the language "willful and malicious injury," the United States Supreme Court found that:

> [T]he word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." . . . [T]he (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences of an act," not simply "the act itself*."

*Id.* at 61-62 (quoting Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964)).

The United States Supreme Court further determined that to adopt the interpretation proposed by the Kawaauhaus would:

> place within the excepted category a wide range of situations in which an act is intentional, but injury is unintended, i.e., neither desired nor in fact anticipated by the debtor. . . . A "knowing breach of contract" could also qualify. A construction so broad would be incompatible with the 'well-known guide that exceptions to discharge

17

"should be confined to those plainly expressed.'

*Id*. at 62 (quoting *Gleason v. Thaw*, 236 U.S. 558, 562 (1915)).

More than a year later, the Sixth Circuit Court of Appeals considered the "willful and malicious injury" language contained in § 523(a)(6), in *Markowitz v. Campbell (In re Markowitz),* 190 F.3d 455 (6th Cir. 1999). The Sixth Circuit Court of Appeals interpreted *Geiger* and noted that:

> [t]he [Supreme] Court's citation to the Restatement's definition of "intentional torts" underscores the close relationship between the Restatement's definition of those torts and the definition of "willful and malicious injury." The Restatement defines intentional torts as those motivated by a desire to inflict injury or those substantially certain to result in injury. Although the Supreme Court identified a logical association between intentional torts and the requirements of § 523(a)(6), it neither expressly adopted nor quoted that portion of the Restatement discussing "substantially certain" consequences.

*Id*. at 464.

Based on the language used and analysis of the United States Supreme Court in *Geiger*, the *Markowitz* Court announced the standard of the Sixth Circuit Court of Appeals by holding that:

> unless 'the actor desires to cause [the] consequences of his act, or . . . believes that the consequences are substantially certain to result from it,' he has not committed a "willful and malicious injury" as defined under § 523(a)(6).

*Id*. (quoting Restatement (Second) of Torts § 8A, at 15 (1964)); *see Kennedy v. Mustaine*, 249 F.3d 576, 580 (6th Cir. 2001).

In addition to proving a willful injury, a party must also prove that the debtor committed a malicious injury. "'Malicious' means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986) (citing *Tinker v. Colwell*, 193 U.S. 473, 486 (1904)). If a party fails to prove either willful or malicious, the debt will be discharged. *Markowitz*, 190 F.3d at 463. Inferences can be

18

made, however, if the circumstances surrounding the alleged injury warrant such:

> Determining whether a debtor acted both willfully and maliciously for purposes of § 523(a)(6) requires an examination of that person's state of mind. A debtor will rarely, if ever, admit to acting in a willful and malicious manner . . . [but] both requirements can be inferred through the circumstances surrounding the [involved] injury.

*O'Brien v. Sintobin (In re Sintobin)*, 253 B.R. 826, 831 (Bankr. N.D. Ohio 2000) (citations omitted).

As previously stated, Section 523(a)(6) "triggers in the lawyer's mind the category 'intentional torts.'" *Kawaauhau v. Geiger*, 523 U.S. at 62. Debts that have been determined to fall under Section 523(a)(6) have involved: defamation, malicious prosecution and abuse of process, conversion, legal malpractice, libel, patent infringement, intentional infliction of emotional distress, and usurpation of corporate business opportunity. *See Kennedy*, 249 F.3d at 576 (defamation); *Markowitz*, 190 F.3d at 455 (legal malpractice); *Ford Motor Credit Co. V. Owens*, 807 F.2d 1556, 1559-60 (11th Cir. 1987) (active conversion of property which is subject to security interest of third party); *Abbo v. Rossi, McCreery & Associates, Inc. (In re Abbo)*, 168 F.3d 930 (6th Cir. 1999) (malicious prosecution and abuse of process; *Wheeler*, 783 F.2d at 610 (state court libel judgment); *Trantham*, 304 B.R. at 298 (pre-petition patent infringement judgment); *Gonzalez v. Moffitt*, 252 B.R. 916 (B.A.P. 6th Cir. 2000) (intentional infliction of emotional distress); *Digital Commerce, Ltd., v. Sullivan*, 305 B.R. 809 (Bankr. W.D. Mich. 2004) (usurpation of corporate business opportunity).

The triggering event for the determination of damages for conversion of property is the value of the property at the time of the conversion, not the balance on the loan. *Owens*, 807 F.2d at 184.

Subsequently, the Sixth Circuit Court of Appeals re-visited this issue in the case of *Kennedy v. Mustaine (In re Kennedy)*, 249 F.3d 576, 581 (6th Cir. 2001). In that case, the Sixth Circuit Court of Appeals reiterating the holdings in *Geiger* and *Markowitz*, summarizing the test under Section

523(a)(6) as: "[O]nly acts done with the intent to cause injury–and not merely acts done intentionally–rise to the level of willful and malicious injury for purposes of satisfying § 523(a)(6).").

D.    Action to Object to Discharge (11 U.S.C. § 727(a)(5))

The Plaintiff argues that the Defendant should be denied a discharge because of 11 U.S.C. § 727 violations.  Section 727(a) of the Bankruptcy Code provides that a debtor is entitled to a discharge unless an exception applies.  Although exceptions to discharge are strictly construed against a creditor, *see Rembert v. AT&T Universal Card Servs., Inc.* (*In re Rembert),*141 F.3d 277, 281 (6th Cir. 1998), "a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor." *Wazeter v. Michigan National Bank (In re Wazeter)*, 209 B.R. 222, 226 (W.D. Mich. 1997).  Pursuant to Federal Rule of Bankruptcy Procedure 4005, the burden of proof in objecting to a discharge under Section 727 is on the plaintiff and must be established by a preponderance of the evidence.  *Barclays/American Bus. Credit, Inc., v. Adams (In re Adams)*, 31 F.3d 389, 394 (6th Cir. 1994).

11 U.S.C. § 727(a)(5) provides that the court shall grant the debtor a discharge unless "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."   The purpose of this section was explained by the court in *Kovacs v. McVay (In re McVay)*, 363 B.R. 824 (Bankr. N.D. Ohio 2006):

> This section is derived from competing concerns: (1) the trustee and creditors' right to question the debtor about their financial affairs; and (2) the knowledge that debtors will not always be completely forthcoming with information about their financial activities.  Section 727(a)(5) seeks to address these competing concerns by conditioning discharge on a debtor satisfactorily explaining any prepetition diminution or loss of asset.  In order to achieve this, paragraph (a)(5) requires debtors to disclose all vital information; there is no requirement of mal-intent or scienter.  In

20

addition, it does not matter under § 727(a)(5) how the loss or deficiency occurred. For example, money spent on illegal activities does not run afoul of § 727(a)(5). Section 727(a)(5) is simply concerned with the adequacy of the debtor's explanation.

*Id.*, 363 B.R. at 830-831 (citations omitted).

To satisfy his initial burden of proof, a plaintiff must show two things: first, that the debtor had a cognizable ownership interest in a specific asset, and second, that the debtor's interest existed at a time not too far removed from when the petition was filed. *Id.* at 831. Once the plaintiff has met its burden, the debtor must satisfactorily explain the loss. The standard for a satisfactory explanation under § 727(a)(5) "is one that is reasonable under the circumstances." *Id.* (quoting *Lacy Wholesale & Main Factors v. Bell (In re Bell)*, 156 B.R. 604, 605 (Bankr. E.D. Ark. 1993)). A reasonable explanation involves capacity for verification. The explanation should enable a trustee to investigate the circumstances of the loss. *Id*.

## Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157, 28 U.S.C. § 1334, and E.D. Mich. LR 83.50. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debts) and (J) (objections to discharges).

## Analysis

### A. Plaintiff has failed to meet its burden of proof as to the terms of its agreement with Defendant

The Court first considers the nature of the agreement between Land Escape and Mr. Bellanti because the nature of that agreement is the foundation of whether Mr. Bellanti's subsequent acts rise to a level to justify excepting his debt from discharge. The Court finds that both Mr. Yatooma and Mr. Bellanti agree on certain terms of their oral agreement, namely that Mr. Bellanti was to follow up, bid on, and supervise various decorative stone projects. The two do not agree on other terms, such as the allocation of expenses, the identification of expenses, or the division of profits. Also,

21

there is no agreement as to who should receive the checks from the owner. Mr. Yatooma testified that the checks should have been sent to Land Escape; Mr. Bellanti testified that the checks should have been and were indeed sent to Intex. Both agreed that Intex, not Land Escape, sent the invoice for services regarding a project to the customer. The customer then paid Intex, not Land Escape.

The burden of proof of the actual terms and conditions of the contract falls upon Land Escape, as the proponent of it. *Teason v. Mills*, 368 Mich. 414, 416, 118 N.W.2d 475 (1962). Here, the Court finds that Land Escape failed to meet its burden of proof as to the contested terms. In particular, neither Mr. Bellanti or Mr. Yatooma sat down at any time prior to Defendant's bankruptcy petition to make the calculations necessary under Mr. Yatooma's version of the contract. While perhaps understandable during the course of the landscaping season, Mr. Yatooma cannot explain to the Court's satisfaction why a more definite accounting was not made in the fall/winter of 2005 or in 2006. Also, Mr. Yatooma's request for payments of amounts not directly related to any project or costs incurred by Land Escape, other than an amount Mr. Yatooma believed necessary to meet his payroll, damages Land Escape's case. In fact, Land Escape did not send Intex or Mr. Bellanti any invoice or written request for payment that Intex or Mr. Bellanti could review and pay or reject to pay. Moreover, Mr. Yatooma did not explain to Mr. Bellanti, and Mr. Bellanti did not consider, the other expenses that one would normally consider in bidding a project, such as overhead, payroll taxes, worker's compensation insurance, gas, equipment rental and depreciation, and other miscellaneous expenses.

The Court also finds it persuasive that the payments for projects were made directly to Intex and not Land Escape. While this fact might not be as persuasive if the payments were only for a few months, the payments continued throughout 2005, all of 2006, and until Intex stopped doing business. Mr. Yatooma, who the Court finds to be a savvy businessman, certainly had the

22

wherewithal to demand that payments be sent directly to Land Escape and not to Intex. This, however, did not happen, which leads the Court to the conclusion that the agreement was not as stated by Mr. Yatooma. In this regard, the Court does note that Land Escape during this time was riding a very fine line. Many of its customers were in the decorative stone business, and part of the reason that Land Escape utilized Intex was to create the illusion that Land Escape was not competing with its customers, when in fact it was. To that end, as testified by Mr. Yatooma, Intex was the known responsible entity even though Land Escape employees were working on decorative stone projects. Mr. Yatooma testified that the customers would not have knowingly allowed its competitor, Land Escape, to have an opportunity to profit from this work or allow its employees on site to potentially criticize the customer's work. To get around this roadblock, Intex gave the necessary cloak. Likewise, when invoices were sent by Intex, there would be no indication to an interested observer that Land Escape was involved in the project when, in fact it was

Finally, the Court concludes that the arrangement as described by Mr. Yatooma leaves Mr. Bellanti at a significant financial disadvantage that few, if any, individuals would voluntarily agree. In particular, if Mr. Yatooma's version is accepted as correct, Mr. Bellanti essentially worked for free for Land Escape and, after Land Escape paid all of its expenses, including overhead and miscellaneous costs, any profits were divided with Land Escape receiving 2/3 and Mr. Bellanti receiving 1/3. If the parties were so concerned about the payment of expenses, then the expenses of Mr. Bellanti, which were significant, should also have been paid before the splitting of profits. Also, there is no explanation as to why the profits would not be split evenly, especially after the argued basis of Land Escape that it incurred more up front costs would be deflected by the payment of those costs. Also instructive is that Mr. Bellanti from 2005 apparently had no significant basis to calculate what Land Escape's actual costs were, so the calculation of his "profit" would be

conjecture at best.

The Court does acknowledge that some of Mr. Bellanti's testimony does not fit squarely as well. For example, Mr. Bellanti said that he was working very hard without pay for quite some time because of his friendship with Mr. Yatooma. While acknowledging that friendships in a business relationship often involve one friend working harder than the other, the extent of the work done by Mr. Bellanti in this case goes beyond the norm. Also, while discussed later in this Opinion, Intex's bookkeeping was rudimentary at best. The actions of Ms. Bellanti in paying Land Escape amounts when requested by Mr. Yatooma, while understandable, do not fit the normal course of what one would expect in a relationship like this.

For these reasons, the Court concludes that Land Escape has not met its burden of proof as to the terms of its agreement with Mr. Bellanti. The Court does conclude that there was a basic agreement that Land Escape would supply employees and some material for decorative stone projects of Intex that Mr. Bellanti oversaw and managed the projects, and that Intex invoiced the customer after completion of the project. Thereafter, Intex paid money to Land Escape as demanded by Mr. Yatooma.

B.      The Plaintiff has failed to meet its burden of proof as to its Section 523(a)(2)(A) claim

After finding that Land Escape has failed to prove the terms and conditions of the contract between it and Mr. Bellanti or Intex, the Court cannot find sufficient evidence that Mr. Bellanti made the necessary false statements with the requisite intent as required by Section 523(a)(2)(A). First, Land Escape has not pointed to specific statements by Mr. Bellanti that were false or misleading. While the Court finds that both Land Escape and Mr. Bellanti and Intex were sloppy bookkeepers, the Court does not see sufficient evidence to find that Mr. Bellanti made false statements or misrepresentations.

24

The Court is mindful that the recent United States Supreme Court case of *Husky* allows the Court to look at the actions of Mr. Bellanti and conclude that a Section 523(a)(2)(A) cause of action exists. The Court has considered the *Husky* criteria in this case and cannot find such a pattern. In particular, the Court notes that the complained of actions of Mr. Bellanti occurred over two years with sufficient time by Mr. Yatooma to investigate, question, and correct Mr. Bellanti's actions. None of this occurred in this case. While the Court does find that Mr. Yatooma found Mr. Bellanti to be a believable individual and that the two of them were friends, the Court also finds that Mr. Yatooma was not as attentive to the enterprise as he should have been. Moreover, Mr. Bellanti clearly was working diligently to make this enterprise a success. The reason they did not succeed is because of the general economic downturn in Michigan and the failure of at least one customer, Todd's Services, to pay. Also, Land Escape has not convinced the Court that Mr. Bellanti intended to deceive it. While some testimony was presented that Mr. Bellanti had such intent, the Court finds that evidence to be insufficient to meet Land Escape's burden of proof.

Taken overall, the Court cannot find the requisite material of misrepresentations or intent to deceive as required under Section 523(a)(2)(A) to sustain Land Escape's case.

C.    The Plaintiff has failed to meet its burden of proof as to its Section 523(a)(4) action

Likewise, the Court fails to find the necessary fraud or false statements of Mr. Bellanti to support Land Escape's Section 523(a)(4) action. Here, the record is insufficient for the Court to conclude that Mr. Bellanti made any statements with the intent to defraud as required under Section 523(a)(4) and as also described previously in this Opinion in its Section 523(a)(2)(A) analysis.

As to the claims of Land Escape under the Michigan Builder's Trust Fund Act, the Court finds it noteworthy that Land Escape did not bill or send an invoice to Intex at any time. As such, the requisite statements required by a sub-contractor or materialman do not exist in this case. Stated

differently, Mr. Bellanti did not know what the expenses of Land Escape were and therefore could not have paid those expenses.  In fact, every time Mr. Yatooma made a demand for payment, Ms. Bellanti made that payment, even though the request for payment was devoid of any paper or factual foundation.  Accordingly, Land Escape's Section 523(a)(4) action must fail.

D.    The Plaintiff has failed to meet its burden of proof as to its Section 523(a)(6) action

Land Escape's Section 523(a)(6) action fails as well.  For many of the reasons stated previously in this Court's analysis of Land Escape's Section 523(a)(2)(A) and Section 523(a)(4) claims, the Court cannot find the requisite intent as required by Section 523(a)(6).  In particular, there is insufficient evidence before the Court that Mr. Bellanti intended to harm Land Escape or cause a specific injury now claimed by Land Escape.  At best, Mr. Bellanti perhaps struggled longer than he should have trying to make the enterprise successful and was not aware of the deep financial difficulties suffered by the enterprise, but he certainly did not have the requisite intent to harm Land Escape either directly or to cause the harm to Land Escape.

E.    The Plaintiff has failed to prove its Section 727(a)(5) claim

Land Escape argues that Mr. Bellanti has not sufficiently explained what happened to his assets and those of Intex.  While the Schedules of Mr. Bellanti and Intex certainly show a lack of assets and in some instances are inconsistent with the facts as later developed at the trial of this matter, Mr. Bellanti has explained sufficiently many of the failures here and given reasons for the remainder.  Also, the Court notes that the general economy in Michigan from 2006-2010 was such that what many people thought was valuable in 2005 had little marketable value in subsequent years. Moreover, the Court notes that the Chapter 7 Trustee found Mr. Bellanti's explanations acceptable and that no further action was taken by the Trustee.  With this record, and noting that the standard to deny a debtor a discharge is high, the Court concludes that Land Escape has failed to meet its

burden of proof as to this claim as well.

Conclusion

For the reasons stated in this Opinion, the Court finds that Land Escape Outdoor Maintenance, L.L.C. has failed to state a cause of action as to all of its claims against Jeremy Bellanti. Counsel for Mr. Bellanti is directed to prepare an order consistent with this Opinion and the presentment of order procedures of this Court.

**Signed on September 27, 2016**

```
                              /s/ Daniel S. Opperman
                         Daniel S. Opperman
                         United States Bankruptcy Judge
```